Filed 5/7/13  R.O. v. Superior Court CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| R.O.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SANTA CLARA COUNTY,<br><br>    Respondent;<br><br>SANTA CLARA COUNTY DEPT. OF FAMILY & CHILDREN'S SERVICES,<br><br>    Real Party in Interest. | No. H039265<br>(Santa Clara County<br>Super. Ct. No. JD20337) |

Petitioner R.O. (the mother) challenges by a petition for an extraordinary writ the juvenile court's order setting a Welfare and Institutions Code section 366.26[1] hearing regarding her daughter R.O. (the child).  The child was originally detained in October 2010 due to the mother's physical abuse of her.  She was removed from the mother's custody until June 2012, when, after the mother had been provided with more than 18 months of reunification services, the child was returned to the mother's care.  The child

---

[1]     Subsequent statutory references are to the Welfare and Institutions Code unless otherwise specified.

spent five months in the mother's custody with family maintenance services before she was again detained due to physical abuse. A section 387 petition was filed alleging that the mother had failed to protect the child. The court sustained the petition, removed the child from the mother's custody, and set a section 366.26 hearing.

The mother claims that the court's decision to remove the child from her custody was erroneous because, during the two-month period between the child's detention in November 2012 and the continued hearing on the section 387 petition in January 2013, the Santa Clara County Department of Family and Children's Services (the Department) failed to make reasonable efforts to prevent or eliminate the need to remove the child from the mother's custody. We reject her contention and deny the petition.

## I. Background

The five-year-old child was detained in October 2010 after the mother hit the child in the face with a belt. The child suffered injuries to her face. The mother admitted that she had intentionally struck the child with a belt and caused the injuries to her face, but she insisted that the injuries were "an accident." The mother admitted that she had hit the child with a belt on 20 prior occasions, beginning when the child was two years old. She was adamant that this was "appropriate" "discipline." The child told the social worker that the mother had caused her injuries by hitting her with a belt. She said she had been hit with a belt by the mother more than 20 times. The child also reported that she had frequently been exposed to seeing her mother having sex with men. The father, a registered gang member with a history of violent crime, was incarcerated at the time of the child's detention and had been incarcerated for most of the child's life. The mother and the father had a history of engaging in domestic violence in the child's presence. The mother reported that the child had been sexually molested by a teenaged boy a couple of months prior to her detention.

At the January 2011 jurisdictional and dispositional hearing, both parents

submitted on the social worker's reports. The social worker reported that the child was "mentally and emotionally fragile" and, as a result of the events to which she had been exposed, engaged in "self-injurious behaviors." The court took jurisdiction over the child and ordered reunification services for the mother. The father, who remained incarcerated, waived reunification services. The court removed the child from parental custody. The mother's case plan required her to complete a "certified 52 week Child Abuser's Treatment program," "[a] program of counseling or psychotherapy" addressing "parenting" and other issues, and a "domestic violence victims' support group." She was granted weekly supervised visitation. The father was not granted visitation but was permitted supervised telephone contact with the child.

The child was placed with a maternal relative caretaker. However, in May 2011, the Department filed a section 387 petition after the maternal relative caretaker asked that the child be removed from the home. In June 2011, the child was placed with a paternal relative caretaker. The section 387 petition was then dismissed at the Department's request.

By the time of the August 2011 six-month review hearing, the mother had completed the domestic violence program and a parent orientation class, but she had not completed the other elements of her case plan. The Department recommended that reunification services continue for the mother, and the court accepted this recommendation.

The mother had not made much progress by the time of the December 2011 12-month review hearing. She continued to attend her child abuser treatment program, but she was frequently late or a no-show for her visits with the child. The Department again recommended that services be continued, and the court again accepted the recommendation.

The child had no contact with the father until late 2011 and early 2012, when the child's caretakers, with the Department's approval, twice took her to visit her father in

3

prison. The caretakers supervised these visits. The mother vocally opposed any visitation between the child and the father.

By the time of the February 2012 interim review hearing, the mother was being allowed increased visitation. The Department was planning to move to unsupervised visits including an overnight visit very soon. The mother was also showing progress in her child abuse treatment program. The child continued to engage in sexualized and self-harming behaviors arising from both her sexual abuse and her exposure to the mother's sexual activities. She also suffered from posttraumatic stress disorder (PTSD), Pica (eating non-nutritious non-food items), and Trichotillomania (hair pulling behaviors) associated with prior abuse.

At the June 2012 18-month review hearing, the Department recommended that the child be returned to the mother with family maintenance services. The Department recommended that the mother receive "intensive home-based family services known as wraparound services" to help her and the child after the child was returned to her care. It also recommended that the father be granted monthly supervised visits if he contacted the social worker after his upcoming release from prison. The court accepted the Department's recommendations, and it returned the child to the mother's care.

In advance of the 18-month review hearing, the mother had "expressed concern that [the child] not have unsupervised visits with her father . . . upon his release . . . [due to] his violent past . . . ." In August 2012, the mother obtained a temporary restraining order against the father that also protected the child. The father was released from prison in October 2012. On October 15, the father contacted the social worker and sought supervised visitation. The mother opposed his request. Due to the restraining order, the social worker did not set any visits. She told the father to attend the next court hearing, then scheduled for mid-November 2012, and request visitation.

After she regained custody of the child in June 2012, the mother did not cooperate with the social worker's attempts to make home visits. She essentially limited the social

worker to contacting the child at school. The child was frequently tardy to school and was often picked up late from school by the mother, and the child no longer completed her homework assignments.

On the first weekend in November 2012, the mother allowed the father to spend the weekend with her and the child despite the child's obvious distress and the child's statements that she did not feel safe with him in the home. A few days later, the mother allowed the father to come to the home again. While he was there, the child came into the bedroom while the mother and the father were in bed together. The child hit the father. The father responded by hitting the child with a belt in the mother's presence. The mother did nothing to help the child, but instead sat on the child in an attempt to stop her from crying. The child had difficulty breathing when the mother was sitting on her. The child had a bruise from this incident.

The social worker became aware of this incident, and the child was detained on November 12, 2012. The Department filed a section 387 petition. The mother initially refused to cooperate with the social worker's investigation of this incident. The day after the child's detention, the mother obtained dismissal of the restraining order that had protected her and the child from the father. At the November 15 detention hearing, the court ordered the child temporarily removed from the mother's care. The mother was granted supervised visitation.

The father denied that he had been at the mother's home, and he insisted that the child had lied about the incident. On November 21, 2012, the mother admitted to the social worker that she had allowed the father to come to the home several times, but she denied that the incident had occurred. She had no explanation for how the child had suffered the documented bruise. The mother denied that the father had spent the night at the home, and she denied that the child had seen them in bed together. She claimed that the child had made these allegations because she was "jealous." The mother falsely claimed that the social worker had led her to believe that it was okay for the child to have

contact with the father, yet she also said she feared the father. The mother asked the social worker to consider the father as a placement for the child. The mother's therapist reported that the therapist did not believe further therapy "would be productive." The child was soon placed with the paternal relative caretakers she had lived with for the year preceding her return to the mother.

The jurisdictional hearing on the section 387 petition was originally set for November 30, 2012. The father requested a contested jurisdictional hearing. The mother joined in the request. The court wanted to set the contested hearing for December 14, but the father requested that it be further delayed. Consequently, the court set the hearing for January 11, 2013. The mother's counsel stated: "I think that may actually help give it a little bit more time with the placement issues that are going on as well." The mother wanted the Department to assess two maternal relatives as possible placements for the child. When the parties appeared on January 11, the mother stated that she was in the process of retaining private counsel, and she sought another continuance.[2] The court reluctantly continued the hearing to January 25.

The contested jurisdictional and dispositional hearing on the section 387 petition was finally held on January 25, 2013. The Department recommended that the child be removed from the mother's custody and that the court set a section 366.26 hearing.

The social worker testified that the mother did not "appreciate the dangers to [the child] in her home," and she questioned whether the mother had the "capacity to keep her daughter safe." The social worker believed that the mother had given her relationship with the father "priority over her daughter's safety and well-being." The social worker had not referred the mother to any services since the child's November 12, 2012 detention. She could not identify any "services [that] could be offered that haven't been

---

[2] She did not retain private counsel, and she was represented by appointed counsel at the January 25 hearing.

6

offered to provide [the mother] the opportunity to demonstrate that she is capable [of keeping] her daughter safe from future harm."

The mother testified at the hearing that the father had called her and asked to visit the child. Although she knew that he was supposed to contact the social worker for visits, he was unwilling to do so. Because the father was "very persistent," she "didn't want to refuse him because I didn't want him to be angry with me." The mother knew that the father had a "temper" and was "very . . . aggressive." He had previously punched her and hit her in front of the child. She admitted that she was aware that there was a restraining order in place. While she claimed that the father had never before physically abused the child, she admitted that the child had told her that she was afraid of the father.

Knowing all of this, she allowed the father to spend the first weekend in November 2012 in her home and to return on November 10, 2012. She could not recall if he spent the night on November 10 nor did she recall seeing him hit the child. She maintained that the child had made up these allegations because she was jealous and wanted more of the father's attention. The mother denied sitting on the child, but she admitted that she had restrained the child when the child was hitting the mother and "in a tantrum." The mother testified that she would no longer allow the father contact with the child because she now understood that he had "lied" about wanting "to change and participate, basically cooperate and be a family man, a father." The mother maintained that the original incident in October 2010 when she hit the child in the face with a belt had been "an accident."

The Department's trial counsel argued to the juvenile court that the mother's testimony was "simply incredible." The mother's trial counsel argued that the Department had failed to show that it had made reasonable efforts to "try and maintain" the child's placement with her mother after the November 2012 detention. He claimed that the November 2012 incident was "a light bulb [that] has gone off for [the mother]," and she now "understands the gravity of this situation."

7

The court found by clear and convincing evidence that "it is not safe to return this child" to the mother's care. "It is not emotionally safe for her, it is not physically safe for her." "I find that the Department has made more than reasonable efforts to return this child to a safe home" and "to keep the child safe in the home . . . ." The court sustained the petition, removed the child from the mother's custody, terminated reunification services, and set a section 366.26 hearing for June 21, 2013. Supervised visitation was continued for the mother, and the father was granted supervised visits in a therapeutic setting if consistent with the child's safety. The mother filed a timely notice of intent to file a writ petition challenging the court's orders. The section 366.26 hearing was thereafter advanced to May 17, 2013. The mother subsequently filed the instant writ petition and sought a stay of the hearing.

## II. Analysis

The mother does not challenge the juvenile court's jurisdictional findings on the section 387 petition. Her sole contention is that the court's decision to remove the child from her custody cannot be upheld because the Department failed to sustain its burden of showing that "reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home . . . ." (§ 361, subd. (d).)

"A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c)(1).) "The court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the

8

need for removal of the minor from his or her home . . . ." (§ 361, subd. (d).) We review the juvenile court's decision to remove the child from the mother's custody to determine whether the requisite findings are supported by substantial evidence. (*In re Javier G.* (2006) 137 Cal.App.4th 453, 462-463.)

The mother claims that the Department's "reasonable efforts" showing was inadequate because the Department did not offer her or the father any services between the child's November 12, 2012 detention and the January 25, 2013 hearing. The reasonable efforts requirement does not mandate that *services* must always be offered between a section 387 detention and the hearing on the section 387 petition.[3] In this case, the mother had already received more than the maximum period of reunification services. Those services had been aimed at protecting the child from being exposed to the physical abuse, sexual activity, and domestic violence that had led to the court taking jurisdiction originally. In addition, during the five months that the child spent in the mother's custody, the mother was provided with very intensive wraparound services carefully designed to protect the child from those same dangers. Despite this wide array of services, the mother exposed the child to precisely the dangers that these many months of extensive services were designed to eliminate. Under these circumstances, the Department had made more than "reasonable efforts" to eliminate the dangers that the child faced in her mother's custody, and the court could reasonably conclude that the decision to not provide additional services was "reasonable."

The mother contends that she "had no reason to suspect" that allowing the father contact with the child "would result in a risk of physical harm." The record strongly rebuts this claim. The mother admitted that she knew that the father was violent, and she

---

[3]     Indeed, had the section 387 hearing been held as scheduled on November 30, 2012, there would have been little time for any meaningful services to be provided during the mere 18 days that would have elapsed since the child's detention.

9

had obtained a restraining order against him to protect both herself and the child that was active at the time of the November 2012 incident. She also knew that the father was barred from seeing the child and that the child feared him and was distressed by his presence. Nevertheless, she permitted the father to come to the home when the child was present thereby exposing the child to fear and distress on top of a very real danger that the father would engage in domestic violence in her presence with the obvious associated risk that the child would suffer physical harm either directly or indirectly. The mother then proceeded to engage in sexual activity while the child was present in the home, despite knowing that the child was highly sensitive to exposure to such activity and that it created a risk that the child would harm herself. The predictable result was that the child was exposed to sexual activity, subjected to physical abuse, and suffered distress that put her physical health at risk. That the mother made these choices despite her knowledge of the risks and despite all of the services that had been and were being provided to her led inescapably to the conclusion that the mother lacked the capacity to protect the child from harm and would never develop that capacity. Only willful blindness can explain the mother's failure to "suspect" that exposing the child to a violent man who had engaged in domestic violence in the child's presence and who the child feared would not create a risk of physical harm to the child, a very fragile child who suffered from several conditions that were exacerbated by her distress and that threatened her physical health. No further "efforts" could be deemed "reasonable" under these circumstances because it was clear that the child's safety could not be protected in her mother's custody.

Nor did the Department have any obligation to provide services to the father. The father was not the custodial parent. While he was involved in the specific incident that led to the child's November 2012 detention, it was the mother's custody of the child that was in question, and it was the mother's inability to protect the child that made removal necessary. There was every reason to believe that the mother would expose the child to dangers other than the father given her failure to absorb the messages that nearly two

10

years of services had been designed to send her. Services to the father, who had waived services and never sought any, would not address the fact that the mother made risky choices and herself physically abused the child during the November 2012 incident by sitting on her and making it difficult for her to breathe.

Because removal was necessary to protect the child from the harm that she faced in her mother's custody, the juvenile court had no other option than to set a section 366.26 hearing. (Cal. Rules of Court, rule 5.565(f).)

### III. Disposition

The petition is denied.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Grover, J.

11